WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Heather Martin,

               Plaintiff,

v.

Carolyn W. Colvin,

               Defendant.

No. CV-13-00625-PHX-BSB

**ORDER**

      Heather Martin (Plaintiff) seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits and supplemental security income under the Social Security Act (the Act).  The parties have consented to proceed before a United States Magistrate Judge under 28 U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure 16.1.  For the following reasons, the Court affirms the Commissioner's decision.

## I.    Procedural Background

      On September 29, 2010, Plaintiff applied for disability insurance benefits under Title II.  (Tr. 139-40.)[1]  She alleged disability beginning on July 16, 2010.  (Tr. 139.)  The Social Security Administration (SSA) denied Plaintiff's claims initially and on

---

[1]  Citations to "Tr." are to the certified administrative transcript of record.  (Doc. 19.)

1   reconsideration, and she requested a hearing before an administrative law judge (ALJ).

2   (Tr. 121.)  After conducting a hearing, the ALJ issued a decision finding that Plaintiff

3   was not disabled under the Act.  (Tr. 12-23.)  This decision became the final decision of

4   the Commissioner when the Social Security Administration Appeals Council denied

5   Plaintiff's request for review.  (Tr. 1-8); *see* 20 C.F.R. § 404.981 (explaining the effect of

6   a disposition by the Appeals Council.)   Plaintiff now seeks judicial review of this

7   decision under 42 U.S.C. § 405(g).

8   **II.     Medical Record**

9       The record before the Court establishes the following history of diagnosis and

10  treatment related to Plaintiff's health.[2]  The record also includes an opinion from a State

11  Agency Physician who examined Plaintiff, but who did not provide treatment, and a lay

12  witness statement.

13      **A.     Treatment Records**

14      Due to injuries Plaintiff sustained in a car accident, Plaintiff had surgery to fuse

15  two vertebrae levels of her cervical spine (C1-C2).  (Tr. 306.)  In August 2006, Plaintiff

16  saw neurologist George Wang, M.D., with complaints of continuing neck pain that

17  radiated into her arms.  (Tr. 293, 306.)  On examination, Plaintiff had full strength in her

18  upper and lower extremities, except for decreased muscle strength in her left bicep.

19  (Tr. 307.)  Dr. Wang also noted that Plaintiff had "mildly decreased sensation on the left

20  upper extremity."  (*Id.*)  She had normal coordination, normal gait, and intact hearing.

21  (*Id.*)   The results of her neurological tests were consistent with mild cervical

22  radiculopathy at vertebrae levels C5 and C6, but were otherwise normal.  (Tr. 293-94,

23  307.)   Plaintiff reported decreased neck pain with Neurontin, but said she still had

24  dizziness and drowsiness.  (Tr. 303.)

25  _____

26      [2]   In addition to physical impairments, Plaintiff alleged several mental
    impairments in her application for disability benefits.  (Tr. 181.)  However, the ALJ
27  found that Plaintiff's alleged mental impairments did not cause any limitations in her
    mental functional abilities.  (Tr. 15-16.)  Plaintiff does not dispute this finding.  Rather,
28  her claims relate to the ALJ's findings regarding her physical functional abilities.
    Accordingly, the Court discusses only the evidence related to Plaintiff's physical health.

On December 15, 2006, Plaintiff saw pain management specialist Nand K. Bhardwaja, M.D., and had several facet injections and an epidural steroid injection (ESI) in her cervical spine.  (Tr. 252-63.)  Her pain did not significantly improve after the treatment. (Tr. 259.)  Dr. Bhardwaja recommended that Plaintiff see a physical therapist, but Plaintiff refused, stating that physical therapy had not helped in the past.  (Tr. 259.) He advised Plaintiff to try Tai Chi and yoga to help with stress, her posture, and her range of motion.  (*Id.*)  He also told Plaintiff that she would "benefit from" biofeedback therapy and recommended that she continue treatment with Dr. Wang.  (*Id.*)

From mid-2007 through mid-2010, Plaintiff saw her family practitioner several times for various complaints and medication refills.  (Tr. 342-64.)  On July 16, 2010, Plaintiff saw Dr. Wang "to follow-up" on her complaints of radiating neck pain. (Tr. 289.)   She reported a progressive worsening of neck pain and mobility issues. (Tr. 291.)  She also complained of migraines, "motion sickness," and dizziness.  (*Id.*) Dr. Wang diagnosed Plaintiff with cervical radiculopathy, migraine with aura, vertigo/dizziness, back pain with paresthesia, and he ordered diagnostic testing. (Tr. 291.)

An electroencephalography (EEG) to assess Plaintiff's "dizzy spells" was normal. (Tr. 264.)   Nerve conduction studies (an electromyogram or EMG) showed cervical radiculopathy at the C5 and C6 vertebrae levels of Plaintiff's spine, but were otherwise normal.  (Tr. 265-67.)  Nerve studies also showed a sensory polyneuropathy affecting Plaintiff's right leg.  (Tr. 270.)  An MRI of Plaintiff's brain related to her migraines was normal.  (Tr. 276.)  An MRI of Plaintiff's cervical spine showed some widening of the joint space suggesting subluxation (partial dislocation).   (Tr. 278.)   An MRI of her lumbar spine showed "mild disc bulge" at the L4-L5 vertebrae level with "mild foraminal narrowing with disc material approaching the undersurface of both exiting L4 nerve roots with bilateral neural foramen."  (Tr. 277.)

To test for peripheral vestibular dysfunction in relation to Plaintiff's dizziness, vertigo, and motion sickness, Dr. Wang ordered a videonystagmography (VNG) study

that was conducted on August 13, 2010.  (Tr. 275, 291.)  The VNG study was abnormal, which the audiologist indicated was "likely due to peripheral vestibular dysfunction." (*Id.*)  However, the audiologist stated that the test was "inconclusive due to incomplete calorics" and she recommended that Plaintiff return to complete additional testing and follow up with Dr. Wang.  (Tr. 275.)  Dr. Wang subsequently diagnosed Plaintiff with "peripheral vertigo."  (Tr. 284.)  He recommended that she continue home exercises for her neck pain and pursue physical therapy for "vestibular exercise."  (Tr. 284, 287.)

Plaintiff saw Dr. Wang again on August 20, 2010.  (Tr. 286.)  His treatment notes state that Plaintiff had numbness and tingling in her upper extremities, and chronic headaches with nausea, photophobia, and phonophobia.  (*Id.*)  During a September 3, 2010 appointment with Dr. Wang, Plaintiff complained of dizziness and vertigo that caused nausea.  (Tr. 282-84.)  She had a gait imbalance and a positive Rhomberg's test. (*Id.*)

On September 9, 2010, Plaintiff began physical therapy for vestibular rehabilitation to address her vertigo, motion sickness, nausea, and dizziness.  (Tr. 381.) Dr. Wang prescribed twelve sessions in six weeks.  (Tr. 381, 396-97.)  Plaintiff returned to physical therapy two weeks later.  (Tr. 394 (9/23/10), Tr. 395 (Plaintiff cancelled a 9/20/10 appointment).)  She reported that she had not been diligent with her exercises because she had shingles.  (Tr. 394.)  She missed her next scheduled appointment. (Tr. 393 (9/27/10)), and cancelled the following appointment.  (Tr. 392 (10/1/10).)  When Plaintiff returned on October 4, 2010, she reported increased dizziness and nausea with activities of daily living.  (Tr. 391.)  Plaintiff's therapist advised her to do her home exercise program and sleep on her left side for several nights.  (*Id.*).  A few days later, Plaintiff reported that she was "a little better," but that she still had to "focus on slow [movements].'"  (Tr. 390 (10/6/10).)

Plaintiff cancelled an October 13, 2010 appointment, and next attended physical therapy on October 18, 2010.  (Tr. 388-89.)  Plaintiff reported that she was only doing her eye and head movement exercises on days when she felt well enough to try them.

1    (Tr. 388.)  Plaintiff's therapist observed that Plaintiff still became dizzy or nauseated

2    with exercise, but noted that she recovered more quickly than at her previous therapy

3    sessions.  (*Id.*)  Plaintiff did not go to physical therapy after October 18, 2010.

4         Plaintiff saw Dr. Wang for a follow-up on November 23, 2010, and she reported

5    that vestibular rehabilitation had made her symptoms worse.  (Tr. 443-45.)  However,

6    Dr. Wang advised Plaintiff to try physical therapy again.  (Tr. 443-44.)  Plaintiff also

7    reported that oxycodone helped her neck pain and headaches.  (Tr. 445.)  Dr. Wang

8    prescribed medication and advised Plaintiff to continue with exercise and massage

9    therapy at home.  (Tr. 445-46.)

10        In January 2011, Plaintiff went to Infinite Wellness several times for chiropractic

11   care for her neck and back pain.  (Tr. 419-22.)  Plaintiff reported increased pain with

12   walking, standing, driving, recreation, and sleeping.   (Tr. 419.)   Her chiropractor

13   repeatedly noted that Plaintiff's pain was showing improvement.  (Tr. 421-22.)

14        **B.     Examining Physician**

15        On December 7, 2010, Jeffrey Levison, M.D., reviewed Plaintiff's treatment

16   records and examined her in relation to her application for disability benefits.  (Tr. 401-

17   09.)  Dr. Levison noted Plaintiff's "allegations" of depression, anxiety, post-traumatic

18   stress disorder (PTSD), headaches, radiculopathy, peripheral neuropathy, peripheral

19   vestibular disorder (dizziness and nausea), and chronic back and neck pain.  (Tr. 405.)

20        On examination, Plaintiff had a full range of motion in her joints and her spine.

21   (Tr. 405.)  She had no tenderness in her spine.  (*Id.*)  She had full muscle strength in her

22   arms and legs, a normal gait, and full grip strength.  (*Id.*).  Dr. Levison noted that, with

23   distraction, Plaintiff "moved her neck freely," "but on direct observation she [was] more

24   methodical about the range of motion, which is complete."  (*Id.*)  Dr. Levison concluded

25   that the "examination [was] completely normal from head to toe."  (Tr. 405.)  He stated,

26   however, that he would consider Plaintiff's allegations when assessing her functional

27   abilities.  (*Id.*)  Dr. Levison opined that, in an eight-hour workday, Plaintiff could lift fifty

28

pounds occasionally and twenty pounds frequently.  (Tr. 406.)  He also opined that Plaintiff had no limitations on walking, standing, or sitting.  (Tr. 407.)

### C.   Lay Witness Statement

In October 2010, Plaintiff's sister Lacey Brimmer completed a third-party function report.  (Tr. 195-202.)  She indicated that Plaintiff's daily activities were limited by pain, dizziness, and nausea.  (Tr. 196, 200.)  She said that Plaintiff could not do housework due to arm pain and that she washed Plaintiff's hair for her and made her meals.  (Tr. 196-97.)  She reported that driving a car made Plaintiff dizzy and nauseous.  (Tr. 198.)  She also testified that Plaintiff rarely went outside and did not shop.  (*Id.*)

## III.   Plaintiff's Background and Administrative Hearing Testimony

At the time of the administrative hearing, Plaintiff was in her late thirties with a high school education and certifications as an aesthetician and makeup artist.  (Tr. 182.)  Her past relevant work included administrative assistant, accounting manager, office manager, and aesthetician.  (Tr. 82.)

Plaintiff testified at the December 2011 administrative hearing.  (Tr. 62-80.)  She testified that she could not work due to motion sickness, dizziness, and nausea stemming from neck injuries she sustained in 1999.  (Tr. 70.)  Plaintiff stated that she left her job as an administrative assistant in early 2010 "to do what [she] love[d], which is aesthetics work."  (Tr. 63, 71.)  Plaintiff started working for a plastic surgeon in 2010.  (Tr. 63.)  She was later asked to resign because she was often sick and undependable.  (Tr. 72.)

Plaintiff testified that she had migraines, which she treated with sleep and taking Excedrin.  (Tr. 73.)  Plaintiff also testified that she had migraines as often as two to three times a week.  (Tr. 73.)  She testified that she could sit or stand for about ten to fifteen minutes at a time.  (Tr. 74.)  She stated that, due to her nausea and dizziness, she could only walk about ten to fifteen yards at a time.  (*Id.*)  She could lift a gallon of milk.  (Tr. 76.)  She testified that she spent most of the day lying down, napped for three to four hours, and was out of bed for about an hour a day.  (Tr. 77.)  She testified that she had lost about seventy-five percent of the range of motion in her neck.  (Tr. 74.)  She could

not focus to read a book or newspaper for very long without "feeling motion sick." (Tr. 74-75.)  Plaintiff testified that although she could shower by herself, she could not wash her hair because the movement made her "motion sick."  (Tr. 76.)  Plaintiff's sister helped wash her hair.  (*Id.*)  Plaintiff further testified that she had trouble concentrating and poor recall, and that she often had to ask someone to explain things to her, such a stories on the radio.  (Tr. 78.)  She also testified that she only left the house for doctor's appointments.  (*Id.*)

Vocational expert Gretchen Bakkhenson also testified at the administrative hearing.  (Tr. 80-87.)  The ALJ described a hypothetical individual with Plaintiff's age, education, prior work experience, and who was limited to medium exertion, but could never climb ladders, ropes, or scaffolds and who could not work around large bodies of water, unprotected heights, dangerous machinery, or operate motor vehicles.  (Tr. 83-84.)  The vocational expert testified that a person with those limitations could perform Plaintiff's past relevant work as an administrative assistant, accounting manager, and office manager.  (Tr. 82-84.)

In response to a question from Plaintiff's attorney, the vocational expert testified that an individual who had to lie down during the day for longer than normal breaks would be unable to sustain any work.  (Tr. 86.)  She also testified that an individual who became physically ill around movement would be unable to work.  (Tr. 86-87.)

**IV.   The ALJ's Decision**

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits).  To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

### A.      Five-Step Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her impairment or combination of impairments is severe.      20 C.F.R. § 404.1520(a) (c).  If a claimant meets steps one and two, she may be found disabled in two ways at steps three through five.  At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's RFC.  At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past work.  20 C.F.R. §  404.1520(a)(4)(iv).  If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B.      The ALJ's Application of the Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the July 16, 2010 alleged disability onset date.  (Tr. 14.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "history of cervical fracture, status post C2-C3 surgery with fusion, cervical and lumbar radiculopathy, dizziness/vertigo, migraine headaches, and obesity."  (*Id.*)  At the third step, the ALJ found that the severity of Plaintiff's impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 17.)   The ALJ next concluded that Plaintiff retained the RFC "to perform a range of light work, as defined in 20 C.F.R. § 404.1567(b) and § 416.967(b) except for the inability to climb ladders, ropes, or scaffolds but could perform the other postural functions frequently."  (*Id.*)  The ALJ also found that Plaintiff should "avoid

1   work in environments with hazards such as unprotected heights, dangerous machinery, or

2   large bodies of water," and that she should "avoid operati[ng] motor vehicles,

3   and . . . fumes, odors, gases, or other pulmonary irritants." (*Id.*)

4        The ALJ concluded that Plaintiff could perform her "past relevant work as an

5   administrative assistant, accounting manager, and office manager."   (Tr. 21.)

6   Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act.  (Tr. 22.)

7   **V.    Standard of Review**

8        The district court has the "power to enter, upon the pleadings and transcript of

9   record, a judgment affirming, modifying, or reversing the decision of the Commissioner,

10   with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The district

11   court reviews the Commissioner's final decision under the substantial evidence standard

12   and must affirm the Commissioner's decision if it is supported by substantial evidence

13   and it is free from legal error.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198

14   (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ

15   erred, however, "[a] decision of the ALJ will not be reversed for errors that are

16   harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

17        Substantial evidence means more than a mere scintilla, but less than a

18   preponderance; it is "such relevant evidence as a reasonable mind might accept as

19   adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

20   (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In

21   determining whether substantial evidence supports a decision, the court considers the

22   record as a whole and "may not affirm simply by isolating a specific quantum of

23   supporting evidence."   *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

24   quotation and citation omitted).

25        The ALJ is responsible for resolving conflicts in testimony, determining

26   credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

27   Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational

28

1  interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc.*

2  *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

3  **VI.   Plaintiff's Claims**

4  In her opening brief, Plaintiff claims that "[t]he ALJ failed to properly consider the

5  claimant's peripheral vestibular dysfunction" (Doc. 20 at 10), "[t]he ALJ failed to

6  properly consider the claimant's migraines and peripheral neuropathy in her decision"

7  (Doc. 20 at 13), "[t]he ALJ erred by mischaracterizing the claimant's testimony"

8  (Doc. 20 at 15), and the ALJ did not "provide specific, germane reasons for discounting

9  [the] lay witness[]" statement.  (Doc. 20 at 17.)  The Commissioner argues that the ALJ's

10  decision is free from legal error and is supported by substantial evidence in the record.

11  (Doc. 21.)

12  **A.   The ALJ's Consideration of Peripheral Vestibular Dysfunction (PVD)**

13  Plaintiff argues that the ALJ erred by referring to her PVD as "dizziness/vertigo."

14  (Doc. 20 at 11.)  She contends that ALJ's RFC determination did not account for the

15  seriousness of Plaintiff's PVD.  (*Id.*)  She also argues that the ALJ did not consider PVD

16  under the correct listing, 2.07 disturbance of labyrinthine-vestibular function.  (*Id.* at 13.)

17  The ALJ discussed the August 2010 VNG study that was conducted to determine

18  whether Plaintiff suffered from PVD.  (Tr. 18-19.)  The ALJ noted that the test was

19  "inconclusive and incomplete," and that the "VNG was abnormal due to incomplete

20  caloric irrigation."  (*Id.*)  Although the audiologist noted that the abnormality was "likely

21  due to [PVD]," she recommended that Plaintiff's treating neurologist complete warm air

22  irrigations to that the VNG could be completed.  (Tr. 19 (citing Admin. Hrg. Ex. 4F at

23  12).)   However, the record did not include any indication that the VNG test was

24  completed.  (Tr. 19.)

25  The ALJ discussed Plaintiff's claims of PVD and her related symptoms of

26  dizziness and nausea.  (Tr. 19.)  Because the record does not include a confirmed

27  diagnosis of PVD, and Dr. Wang diagnosed Plaintiff with "peripheral vertigo," not PVD,

28  the ALJ did not err by finding Plaintiff's "dizziness/vertigo" a severe impairment, rather

than using the term PVD.  (Tr. 14.)  Moreover, the ALJ considered Plaintiff's complaints of dizziness, motion sickness, and nausea in assessing an RFC that included "avoid[ing]" the operation of motor vehicles, and avoiding unprotected heights, dangerous machinery, large bodies of water, fumes, odors, gases, and "pulmonary irritants."  (Tr. 19.)

Plaintiff also complains that the ALJ should have considered whether her PVD met the criteria of the listing for "[d]isturbance of labyrinthine-vestibular functions," 20 C.F.R. pt. 404, subpart P, app. 1 § 2.07.   (Doc. 20 at 12-13.)   At step three of the sequential evaluation process, the ALJ determines whether a claimant's impairments meet or equal the criteria of any of the impairments that SSA has determined are presumptively disabling, as set forth in the Listing of Impairments (the Listings).   20 C.F.R. §§ 404.1520, 416.920.  Meeting the requirements of a listed impairment at Step Three is "a very high standard."  *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011).  "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing."  *Id.* at 611-12.  A claimant must satisfy all of the specified medical requirements of a particular listing.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).   "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.* at 531.

Listing 2.07 requires "a history of frequent attacks of balance disturbance, tinnitus, and progressive hearing loss" with both "[d]isturbed function of vestibular labyrinth, demonstrated by caloric or other vestibular tests," and "hearing loss established by audiometry."   20 C.F.R. Pt. 404, subpt. P, App. 1 § 2.07.   Plaintiff argues that a Rhomberg's test (Tr. 284, 291), the VNG study (Tr. 275), her "ear problems (Tr. 398), and phonophobia from her migraines (Tr. 286, 290) satisfied the criteria for listing 2.07. (Doc. 20 at 13.)

As previously stated, the VNG test was inconclusive.  Additionally, Plaintiff does not explain how her citation to a 2010 treatment note recording Plaintiff's statement that "her visual symptoms have been worse to deal with than her ear problems in recent past" (Doc. 20 at 13 (citing  Tr. 398)) satisfies Listing 2.07's criteria of "hearing loss

1   established by audiometry."  In short, Plaintiff did not introduce "medical findings equal

2   in severity to all criteria" for that listing.  *See Sullivan*, 493 U.S. at 531.

3         **B.**      **The ALJ's Consideration of Migraines and Peripheral Neuropathy**

4                **1.**      **Migraine Headaches**

5         Plaintiff next argues that, although the ALJ considered Plaintiff's migraines a

6   severe impairment, she erred by failing to include any limitations in Plaintiff's RFC for

7   migraines.  (Doc. 20 at 14.)  Plaintiff asserts, without citing any legal authority, that

8   "[r]easonable accommodations for migraines might be avoiding bright lights, loud noises,

9   [and] opportunities for unscheduled breaks or leav[ing] early . . . ."  (Doc. 20 at 14.)

10        Although the ALJ found Plaintiff's migraine headaches a severe impairment

11  (Tr. 14), she later noted Plaintiff's testimony that her migraine headaches were treated by

12  sleeping and taking Excedrin.  (Tr. 18).  She also noted that a 2010 MRI of Plaintiff's

13  brain did not show evidence of "acute infarct, mass lesion, or abnormal enhancement."

14  (Tr. 18 (citing Admin. Hrg. Ex. 4F at 13).)  Thus, even if the ALJ did not consider

15  Plaintiff's migraines in determining her RFC, the ALJ did not error because she did not

16  find limitations related to Plaintiff's migraines.  *See* 20 C.F.R. § 416.945(a) (stating that a

17  claimant's "impairment(s) and any related symptoms . . . *may* cause physical and mental

18  limitations that affect what you can do in a work setting.") (emphasis added).

19        Additionally, Plaintiff's speculation regarding the existence of "reasonable

20  accommodations" for migraine headaches is not pertinent to a claim for disability

21  insurance benefits under the Act.  In the context of a claim for disability benefits under

22  Title II of the Act, the RFC establishes a claimant's maximum abilities considering her

23  limitations or restrictions.  20 C.F.R. § 416.945(a).  In other words, "the RFC is meant to

24  describe the claimant's residual abilities or what the claimant can do, not what maladies a

25  claimant suffers from — though the maladies will certainly inform the ALJ's conclusion

26  about the claimant's abilities."  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th

27  Cir. 2002), *limited on other grounds as explained by Webb v. Comm'r of Soc. Sec.*, 368

28  F.3d 629, 631-33 (6th Cir. 2004).  Plaintiff's RFC should not be confused with

1  "reasonable accommodations" that arise in the context of employment-related disability

2  claims, such as claims under the Americans with Disabilities Act (ADA).  *See In Kimbro*

3  *v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir.), *cert. denied*, 498 U.S. 814 (1990)

4  (holding that a leave of absence was a reasonable accommodation for an employee whose

5  cluster migraine headaches, a condition for which there was no specific treatment

6  program, caused him to miss work sporadically); *Cleveland v. Policy Mgmt. Sys Corp.*,

7  526 U.S. 795, 803 (1999) (explaining that "when the SSA determines whether an

8  individual is disabled for [Social Security disability insurance] purposes, it does not take

9  the possibility of 'reasonable accommodation' into account").  Accordingly, the ALJ did

10  not err by failing to consider "reasonable accommodations" for Plaintiff's migraines.

## 2.  Peripheral Neuropathy

12  Plaintiff also argues that the ALJ erred by not addressing the peripheral

13  neuropathy in Plaintiff's arms and legs despite those issues being mentioned in the

14  application for benefits (Tr. 181), an electromyography study showing sensory

15  polyneuropathy affecting the right sural and medial plantar nerves (Tr. 270), and

16  treatments notes showing polyneuropathy as a diagnosis (Tr. 399, 445).  (Doc. 20 at 14.)

17  Plaintiff argues that neuropathy causes numbness, pain, and nerve damage, and thus

18  "causes problems standing and walking."   (Doc. 20 at 15.)   Plaintiff asserts that

19  "[n]umbness and pain in the feet *would* affect the ability to stand and walk."  (*Id.*

20  (emphasis added).)

21  Plaintiff's general discussion of neuropathy does not support her claim of error.

22  Plaintiff cannot establish that her neuropathy was a severe impairment or that it was

23  disabling by discussing the potential symptoms and limitations that may result from that

24  condition.  The existence of any condition is not enough for it to be disabling, there must

25  be some related functional loss.  *See* 20 C.F.R. §§ 404.1505(a), 404.1529(c).  Plaintiff has

26  the burden of "proving that [her] impairments or their symptoms affect his ability to

27  perform basic work activities."  *See Edlund v. Massanari*, 253 F.3d 1152, 1159-60 (9th

28  Cir. 2001).   Here, although Plaintiff claims that neuropathy in her lower extremities

"would affect the ability to walk or stand," (Doc. 2 at 15), she does not cite to record evidence indicating that her ability to stand and walk was limited by her alleged neuropathy.  *See Bickell v. Astrue*, 343 F. App'x 275, 278 (9th Cir. 2009) (unpublished) (a claimant's reliance on medical diagnoses that the ALJ rejected at step two was unavailing as the diagnoses did not identify any functional limitations).  Accordingly, even if the ALJ erred by failing to discuss Plaintiff's allegations of peripheral neuropathy, that error was harmless.

### C.    Plaintiff's Symptom Testimony

#### 1.    Assessing a Claimant's Credibility

Plaintiff next argues that the ALJ erred by rejecting her symptom testimony. (Doc. 20 at 15.)   An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom.  *Smolen*, 80 F.3d at 1282.  Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected" to produce her pain.  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1160-61 (9th Cir. 2008) ("requiring that the medical impairment could reasonably be expected to produce pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").  It is undisputed that Plaintiff presented evidence of an impairment that could produce the alleged symptoms.

Second, if a claimant produces medical evidence of an underlying impairment that is reasonably expected to produce some degree of the symptoms alleged, and there is no

1   affirmative evidence of malingering, an ALJ must provide "clear and convincing"

2   reasons" for an adverse credibility determination.[3]  *See Smolen*, 80 F.3d at 1281; *Gregor*

3   *v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).  When evaluating a claimant's credibility,

4   the ALJ may consider the objective medical evidence, the claimant's daily activities, the

5   location, duration, frequency, and intensity of the claimant's pain or other symptoms,

6   precipitating and aggravating factors, medication taken, and treatments for relief of pain

7   or other symptoms.  *See* 20 C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

8       An ALJ may also consider such factors as a claimant's inconsistent statements

9   concerning symptoms and other statements that appear less than candid, the claimant's

10  reputation for lying, unexplained or inadequately explained failure to seek treatment or

11  follow a prescribed course of treatment, medical evidence tending to discount the severity

12  of the claimant's subjective claims, and vague testimony as to the alleged disability and

13  symptoms.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Smolen*, 80

14  F.3d at 1284.  If substantial evidence supports the ALJ's credibility determination, that

15  determination must be upheld, even if some of the reasons cited by the ALJ are not

16  correct.  *Carmickle*, 533 F.3d at 1162.

17  / / /

18  / / /

19  / / /

20

21      [3]  Relying on the Ninth Circuit's decision in *Bunnell*, the Commissioner argues

22  that an ALJ need not provide "clear and convincing" reasons for discrediting a claimant's testimony regarding subjective symptoms, and instead must make findings that are

23  "'supported by the record' and 'sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds.'"
    (Doc. 21 at 12 n.3 (citing *Bunnell*, 947 F.2d at 345-46).)  In *Bunnell*, the court did not

24  apply the "clear and convincing" standard, and the Commissioner argues that because no subsequent en banc court has overturned *Bunnell*, its standard remains the law of the

25  Ninth Circuit.  (Doc. 18 at 8-9.)  Although the Ninth Circuit has not overturned *Bunnell*, subsequent cases have elaborated on its holding and have accepted the clear and

26  convincing standard.  *See Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Lingenfelter*, 504

27  F.3d at 1036; *Reddick*, 157 F.3d at 722; *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989).  Accordingly, the Court will determine whether the ALJ provided clear and

28  convincing reasons for discounting Plaintiff's credibility.

1  
2  
3  

### 2.    The ALJ's Credibility Determination

Here, Plaintiff testified at the administrative hearing that she could not work due to dizziness and nausea.  (Tr. 18.)  She also testified that she could sit or stand for fifteen minutes and walk ten to fifteen yards, and that various movements made her nauseous or caused vomiting.  (*Id.*)  The ALJ found Plaintiff's testimony regarding the severity of her symptoms "diminished."  (Tr. 18.)  Plaintiff argues that the ALJ erred in discounting her subjective complaints because she did not point to anything in Plaintiff's testimony or her daily activities that suggested that she was capable of light work, and other than noting that she was able to drive herself or ride in a car to her last job.  (Doc. 20 at 16.)  She asserts that the ALJ did not give any other reasons for discounting Plaintiff's credibility.  (*Id.* at 16-17.)

Because there was no evidence of malingering (Tr. 18), the ALJ was required to provide clear and convincing reasons for concluding that Plaintiff's subjective complaints were not wholly credible.  Contrary to Plaintiff's assertion, the ALJ gave several clear and convincing reasons to support her credibility determination, including that Plaintiff's testimony that she was unable to drive or ride in a car was inconsistent with her extended commute to her last job, Plaintiff was noncompliant with physical therapy, her alleged limitations were inconsistent with the medical record, and there were gaps in Plaintiff's treatment for her musculoskeletal symptoms.  (Tr. 20.)

The ALJ properly discounted Plaintiff's credibility on these grounds.  As part of the overall disability analysis, and in weighing various allegations and opinions, the ALJ must consider whether there are any inconsistencies in the evidence, such as Plaintiff's inconsistent statements.   *See* 20 C.F.R. § 404.1529(c)(4) (stating that an ALJ must consider "whether there are any inconsistencies in the evidence"); SSR 96-7p, 1996 WL 374186, at *5 (stating that a strong indicator of the credibility an individual's statements is their consistency, both internally and with other information in the record); *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) ("Credibility determinations do bear on evaluations of medical evidence when an ALJ is presented with conflicting medical

opinions or an inconsistency between a claimant's subjective complaints and his diagnosed condition.").  Thus, the ALJ properly considered the inconsistency between Plaintiff's testimony that she could not drive or ride in a car and evidence that she had an extended commute to her last job and either drove or rode in a car to get there.  (*Compare* Tr. 72 *with* Tr. 71.)

The ALJ also properly discounted Plaintiff's symptom testimony regarding dizziness, nausea, and motion sickness based on her noncompliance with treatment for vestibular rehabilitation.  (Tr. 19.)  A claimant's failure to comply with treatment is a legitimate basis for discounting a claimant's subjective complaints.  *See Morris v. Astrue*, 2012 WL 3548040, at *4 (C.D. Cal. Oct. 18, 2012) ("Plaintiff's allegation he suffers from disabling pain is undermined by his failure to consistently seek treatment, to use any medication, and by solely conservative treatment . . . .").

Here, the record reflects that Plaintiff attended five physical therapy appointments that Dr. Wang prescribed for vestibular exercise.  (Tr. 284, Tr. 397, 394, 391, 390, 388.) The record also reflects that Plaintiff missed four other appointments.  (Tr. 389, 392, 393, 394-95.)  Plaintiff argues that she missed one physical therapy appointment because she was "too dizzy to drive."  (Doc. 22 at 7 (citing Tr. 392).)  The record, however, reflects that she missed an appointment because she thought she had shingles (Tr. 394-95), was a no-show for another appointment (Tr. 393), and missed another appointment because she "could not get out of bed," but does not provide further explanation.  (Tr. 389.)  The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities.  *See Andrews,* 53 F.3d at 1039.  The ALJ reasonably concluded that, based on her missed physical therapy appointments, Plaintiff was noncompliant with treatment.[4] Although the record evidence could be construed more favorably to Plaintiff, "[w]hen the

---

[4]   Having found that the missed therapy appointments support the ALJ's conclusion that Plaintiff was non-compliant with treatment for vestibular rehabilitation, the Court does not address the ALJ's other grounds for finding Plaintiff's non-compliant with that treatment.  (Tr. 19.)

1    evidence before the ALJ is subject to more than one rational interpretation, [the court]

2    must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198.

3        Moreover, even if the ALJ erred in discounting Plaintiff's symptom testimony

4    related to her dizziness, nausea, and motion sickness, any error was harmless because the

5    ALJ gave Plaintiff "the benefit of the doubt" and considered these symptoms in assessing

6    an RFC that included findings that she should "avoid work in environments with hazards

7    such as unprotected heights, dangerous machinery, or around large bodies of water; avoid

8    operation of motor vehicles; and avoid work in environments with fumes, odors, gases, or

9    other pulmonary irritants." (Tr. 19.)

10       The ALJ also properly discounted Plaintiff's symptom testimony regarding

11   limitations on her ability to sit or stand due her musculoskeletal impairments because her

12   complaints of extreme limitations were inconsistent with the medical record and there

13   were gaps in her treatment for musculoskeletal impairments. (Tr. 19-20.) As part of the

14   overall disability analysis, the ALJ must consider whether there are any inconsistencies in

15   the evidence. *See* 20 C.F.R. § 404.1529(c)(4) (stating that an ALJ must consider

16   "whether there are any inconsistencies in the evidence."); SSR 96-7p, 1996 WL 374186,

17   at *5 (stating that a strong indicator of the credibility an individual's statements is their

18   consistency, both internally and with other information in the record); *Webb*, 433 F.3d at

19   688 ("Credibility determinations do bear on evaluations of medical evidence when an

20   ALJ is presented with conflicting medical opinions or an inconsistency between a

21   claimant's subjective complaints and his diagnosed condition.").

22       Here, although Plaintiff testified that she could stand or sit for fifteen minutes

23   before she had to shift position or her legs began to ache, the medical record contained

24   evidence that Plaintiff's cervical radiculopathy was "mild" (Tr. 19 (citing Admin. Hrg.

25   Ex. 4F at 30-31)), an MRI of the cervical spine did not reveal any "significant forminal or

26   central canal stenosis" (Tr. 19 (citing Admin. Hrg. Ex. 4F at 15)), and an MRI of

27   Plaintiff's lumbar spine showed "mild degenerative changes," with "mild foraminal

28   narrowing and no significant spinal canal stenosis. (Tr. 19 (citing Hrg. Ex. 4F at 14.)

The ALJ properly discounted Plaintiff's credibility based on the inconsistencies between Plaintiff's allegations of extreme limitations and the medical records showing that Plaintiff's medical conditions were "mild."  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (claimant's credibility was undermined when her allegations about her symptoms were disproportionate and not supported by objective medical findings).

Additionally, the ALJ gave great weight to the opinion of examining physician Dr. Levison, which supported the ALJ's finding that Plaintiff's alleged functional limitations were inconsistent with the medical record.[5]  (Tr. 20.)  On physical examination, Dr. Levison found no abnormalities.  (Tr. 404.)  He found that Plaintiff had a normal gait, could heel-toe walk, hop on either leg, squat, and tandem walk.  (Tr. 404.) He also noted that she had a full range of motion in her joints and her spine, no tenderness in her spine, full muscle strength in her arms and legs, and full grip strength. (Tr. 405.)  Dr. Levison concluded that "examination today is completely normal from head to toe."  (*Id.*)

The ALJ further noted that, before the disability onset date, in 2006 Plaintiff had cervical facet joint nerve blocks and cervical epidural steroid injections with little

---

[5]   In her opening brief, Plaintiff does not argue that the ALJ erred by assigning great weight to Dr. Levison's opinion.  (Doc. 20.)  Rather, she only asserts the following claims: "A. The ALJ failed to properly consider the claimant's peripheral vestibular dysfunction" (Doc. 20 at 10); "B. The ALJ failed to properly consider the claimant's migraines and peripheral neuropathy in her decision" (Doc. 20 at 13), "C. The ALJ erred by mischaracterizing the claimant's testimony" (Doc. 20 at 15), and the ALJ did not "provide specific, germane reasons for discounting lay witnesses."  (Doc. 20 at 17.)

In her opening brief, Plaintiff challenges the ALJ's statement that the "physical consultative exam was essentially normal (Doc. 20 at 12 (citing Tr. 20)) by arguing that the consultative "exam did not perform a Rhomberg test to assess vestibular dysfunction despite it only taking a minute and the examiner knew that the major issue was peripheral vestibular dysfunction."  (Doc. 20 at 12.)  Plaintiff, however, raised this issue in the context of her claim that the ALJ erred in failing to consider her peripheral vestibular dysfunction a severe impairment, and did not argue that the ALJ erred in assigning weight to Dr. Levison's opinion regarding Plaintiff's ability to perform work-related physical activities.  (Doc. 20 at 10-12.)  Accordingly, the Court will not consider whether the ALJ properly assigned weight to Dr. Levison's opinion.  *See Carmickle v. Comm'r Soc. Sec. Admin*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2007) (noting that the court generally will not consider matters that are not specifically and distinctly raised in an opening brief).

improvement. (Tr. 20 (citing Admin. Hrg. Exs. 1F, 2F, 3F at 2.)  Plaintiff, however, did not pursue other recommended treatment because she claimed such treatment had not been helpful in the past.  (Tr. 20 (citing Admin. Hrg. Ex. 3F at 2).)  The record reflects that Plaintiff did not seek further treatment for those particular symptoms until July 2010.  (Tr. 289.)  The ALJ did not err in discounting Plaintiff's subjective complaints based on a gap in her treatment history between 2006 and 2010.  The treatment the claimant received is a legitimate consideration in a credibility finding.  *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged); *see also Burch*, 400 F.3d at 681 (finding the ALJ's consideration of the claimant's failure to see treatment for a three or four month period was "powerful evidence" and an "ALJ is permitted to consider lack of treatment in his credibility determination).  Moreover, even if the ALJ erred by rejecting Plaintiff's symptom testimony related to her musculoskeletal impairments, any error was harmless because he gave Plaintiff the "benefit of the doubt" and assessed her with an RFC "at the light exertional level with postural restrictions."  (Tr. 20.)

### D.    Lay Witness Testimony

Finally, Plaintiff argues that the ALJ erred because she did not provide legally sufficient reasons for discounting the third-party statement from her sister Lacey Brimmer.  (Doc. 20 at 17.)  As stated in 20 C.F.R. §§ 404.1513(d) and 416.913(d), an ALJ may, "in addition to evidence from the acceptable medical sources . . . also use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects his ability to work."  20 C.F.R. §§ 404.1513(d), 416.913(d) (2005).  Such other sources include spouses, parents and other care givers, siblings, other relatives, friends, neighbors, and clergy.  20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4).  Thus, lay witness testimony by family members who have the opportunity to observe a claimant on a daily basis "constitutes qualified evidence" that the ALJ must consider.  *Sprague v. Bowen*, 812 F.2d 1226, 1231-32 (9th Cir. 1987); *see Dodrill v. Shalala*, 12 F.3d 915, 919

(9th Cir. 1993) ("[a]n eyewitness can often tell whether someone is suffering or merely malingering . . . .   [T]his is particularly true of witnesses who view the claimant on a daily basis . . . ."). To reject lay testimony, an ALJ must give reasons "germane to each witness" for doing so.  *Dodrill*, 12 F.3d at 919.

Here, the ALJ gave "little weight" to Ms. Brimmer's third-party report because her answers to the questions on the form were essentially the same as Plaintiff's report of her subjective complaints, and the ALJ rejected Plaintiff's subjective complaints.  (Tr. 21.) As the ALJ noted, the lay witness testimony did not describe any limitations not already reported by Plaintiff.  The ALJ properly found that clear and convincing reasons for discounting Plaintiff's subjective complaints applied to the lay witness's testimony.  *See Pederson v. Comm'r Soc. Sec. Admin.*, 405 F. App'x 117, 119 (9th Cir. 2010) (citing *Stout v. Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006)) (stating that when lay testimony essentially repeated claimant's self-imposed limitations and reports of pain, and ALJ found claimant lacked credibility, and another lay witness' testimony did not materially add to claimant's own statements, failure to discuss the testimony was harmless because "no reasonable ALJ would have reached a different result based on that testimony.").

## VII.   Conclusion

Based on the Court's review of the record, the Court finds that the Commissioner's decision is free from harmful legal error and is supported by substantial evidence in the record.  Accordingly, the Court affirms the Commissioner's decision.

Accordingly,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**IT IS ORDERED** that the Commissioner's decision denying Plaintiff's application for disability insurance benefits is **AFFIRMED**.  The Clerk of Court is directed to enter judgment in favor of Defendant and to terminate this action.

Dated this 31st day of July, 2014.


Bridget S. Bade
United States Magistrate Judge